IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


The Ohio Bureau of Workers'          :
Compensation,
                                     :
        Plaintiff,
                                     :
    v.                                    Case No. 2:05-cv-0673
                                     :
MDL Active Duration Fund,                 JUDGE GRAHAM
LTD., et al.,                        :

        Defendants.                  :

OPINION AND ORDER

    This is a diversity action brought by the Ohio Bureau of
Workers' Compensation ("Bureau") alleging violations of Ohio state
law.   On September 19, 2005, defendants Steven Sanders, Edward
Adatepe, MDL Active Duration Fund, Ltd., Warwick Fiduciary
Services, Ltd., Hamilton Fiduciary Services, Ltd., Oskar P.
Lewnowski, and C. Raymond Morrison filed motions to dismiss for
lack of personal jurisdiction.[1]   For the following reasons, the
defendants' Motion to Dismiss the Complaint is granted as to the
individual director defendants and denied as to the Fund.

I.

    Procedurally, the jurisdictional question has been presented
to the Court by way of a motion to dismiss.   Each party has
supported its respective motion or response with additional
evidence, including affidavits and documents.   It is the Bureau's
burden to show that personal jurisdiction exists.   Compuserve v.
Patterson, 89 F.3d 1257, 1261-62 (6th Cir. 1996).   However, as
here, where no evidentiary hearing is held on the jurisdictional
issue, "the Court must consider the pleadings and affidavits in a

---

[1] This Court notes that defendants Mark D. Lay and MDL
Capital Management have consented to jurisdiction in this Court.

light most favorable to the plaintiff" and the plaintiff "need only make a *prima facie* showing of jurisdiction." Id., citing Theunissen v. Matthews, 935 F.2d 1454, 1458-59 (6th Cir. 1991). The Court will analyze the parties' factual submissions in accordance with these guiding principles.

                                II.

The Bureau is an Ohio governmental agency, organized and existing under the laws of Ohio, entrusted with the responsibility of maintaining a trust fund for Ohio employers and employees. In 1997, the Bureau selected MDL Capital as the Bureau's fixed-income investment manager. Through the investment management agreement, which was executed in Columbus, Ohio, the Bureau initially allocated $55 million for MDL Capital to manage in its long-bond account. Over the course of the following six years, the Bureau allocated an additional $300 million.

In 2002, MDL Capital formed MDL Active Duration Fund ("the Fund"), a Bermuda mutual fund company. The Fund was created as "an investment vehicle through which it could solicit United States tax-exempt institutional investors and non-United States persons to invest in a portfolio consisting primarily of United States Treasury notes and bonds, United States government agency notes and bonds, and corporate and mortgage-backed fixed income securities." (Amended Complaint at ¶25.) The Fund was governed by a Memorandum of Association and the By-Laws of MDL Active Duration Fund, Ltd., which gave the Fund's Board of Directors general management and investment authority.

In November 2002, the Fund entered into an Investment Advisory Agreement with MDL Capital. The Investment Advisory Agreement "delegated general authority to MDL Capital to manage the investment and reinvestment of the assets of the Fund and to administer the Fund's business and administrative operations...." (Id. at ¶30.) As the Fund's investment manager, MDL Capital

                                2

selected Olympia Capital International Inc. ("Olympia Capital"), a British Virgin Islands Corporation, as the Fund's administrator. Further, Olympia Capital (Bermuda), Ltd., an affiliate of Olympia Capital, assisted Olympia Capital in its duties. Because MDL Capital, Olympia Capital, and Olympia Capital (Bermuda) were all involved in the Fund's operations, the Fund's Board of Directors was initially comprised of individuals from those entities. Specifically, the original individuals serving on the Board of Directors were Mark Lay, a Pennsylvania citizen employed by MDL Capital; Steven L. Sanders, a Pennsylvania citizen employed by MDL Capital; Edward Adatepe, a Pennsylvania citizen employed by MDL Capital; Oskar P. Lewnowski, a citizen of Austria and Bermuda resident employed by Olympia Capital and Olympia Capital (Bermuda); and C. Raymond Morrison, a citizen of the United Kingdom and Bermuda resident employed by Olympia Capital and Olympia Capital (Bermuda). Eventually, in 2004, Messrs. Lewnowski and Morrison relinquished their positions on the Board of Directors and were replaced by Hamilton Fiduciary Services, Ltd. and Warwick Fiduciary Services, Ltd.

To solicit investors into the Fund, the Fund, with MDL Capital's assistance, created a Private Placement Memorandum ("PPM"), which highlights the Fund's purposes, investment strategies, and objectives.

> The PPM provides that the investment objective (the "Investment Objective") of the Fund is to concentrate on investments in United States [notes and bonds], and corporate and mortgage-backed fixed income securities to generate consistent positive returns and to achieve an investment return in excess of that from the investment grade, broad-market debt securities reflected in the Lehman Brothers Government Credit Bond Index. The PPM [also] provides that the Funds is to endeavor to meet the Investment Objective by seeking to outperform the Lehman Brothers Government Credit Bond Index when interest rates are generally

3

> declining; by seeking to protect principal
> during periods when rates are generally
> rising; by engaging in trading that consists
> primarily of long positions in fixed income
> securities; and by following an "active
> duration" approach (the "Investment
> Strategies").

(Id. at ¶¶41-42.)

To invest in the Fund, an investor was required to purchase redeemable, non-voting participating shares of the Fund through a subscription agreement. Eventually, in 2003, the Bureau was presented with the opportunity of purchasing shares in the Fund. In September 2003, the Bureau set aside $100 million from its long-bond account with MDL Capital to purchase shares in the Fund. Subsequently, in 2004, the Bureau allocated an additional $100 million from its MDL Capital long-bond account to purchase more shares in the Fund.

As indicated in the PPM,

> [t]he Fund is expected to leverage the Fund's
> investment portfolio as a means to increase
> yield and enhance total return. Up to 150% of
> the Fund's assets (other than U.S. Treasury
> Securities), at the time of investment, may be
> leveraged (i.e., the combined value of
> borrowings and short positions). In the case
> of U.S. Treasury Securities, the amount of
> leverage utilized by the Fund will likely be
> significantly higher in many cases.

(PPM at p. 3.) According to the Bureau, the Fund deviated from the 150% PPM leveraging limit. The complaint states that "[a]t the May 18, 2004 meeting of the Fund's Board of Directors, the [members of the Board] and the Fund together devised a plan to deceive the Bureau into consenting to the earlier deviations and the planned future deviations from the Promised Leverage Guideline and the Investment Strategies." (Amended Complaint at ¶63.)

In August 2004, the Fund's Board of Directors issued a letter from Bermuda to the Bureau entitled "Recent Changes to MDL Active

4

Duration Fund, Ltd." ("the letter").  Attached to the letter was a document entitled "Confidential Private Placement Memorandum," which, if accepted by the Bureau, would amend the original PPM "by adding an exception to the Promised Leverage Guideline with respect to United States treasury securities."  (Id. at ¶69.)  The Letter notified the Bureau that (1) Lewnowski and Morrison had resigned from the Fund's Board of Directors and were replaced by Hamilton Fiduciary and Warwick Fiduciary; (2) Olympia Capital had been appointed as "Representative of the Fund;" and (3) "leveraging of United States treasury securities 'has been and will continue to be significantly higher than 150%.'" (Id. at ¶70 (citing the letter)). The letter contained a signature line for the Bureau's representative to approve the alleged changes.

From August 2004 to September 2004, the Fund and its Board of Directors "solicited the Bureau to agree to the changes contained in the Proposed Revisions Letter and the Proposed Revised PPM through the Proposed Revisions Letter itself and through email correspondence and telephone calls directed to the Bureau's investment department in the State of Ohio."  (Id. at ¶73.)  The Fund indicated, through e-mail communications, that the Bureau needed to acknowledge and agree to any changes to the 150% leveraging guideline before the Fund could leverage any money greater than that amount.  (Id. at ¶76.)

In September 2004, the Bureau notified the Fund that the Bureau would not sign the Letter or agree to any of the proposed changes.  The Bureau believed that leveraging assets in excess of 150% was a material change to the original agreement.  Because the Bureau discovered that the Fund and its Board of Directors leveraged assets in excess of 150%, and subsequently lost more than $216 million, the Bureau brought suit against the Fund and its individual Board of Directors alleging, inter alia, tortious acts, breach of contract, and violations of Ohio securities laws.

5

III.

In diversity cases, federal courts apply the law of the forum state to determine whether personal jurisdiction exists. LAK, Inc. v. Deer Creek Enterprises, 885 F.2d 1293, 1298 (6th Cir. 1989). "Jurisdiction may be found to exist either generally, in cases in which a defendant's 'continuous and systematic' conduct within the forum state renders that defendant amendable to suit in any lawsuit brought against it in the forum state, or specifically, in cases in which the subject matter of the lawsuit arises out of or is related to the defendant's contacts with the forum." Nationwide Mutual Ins. v. Tryg International Ins. Co., 91 F.3d 790, 793 (6th Cir. 1996)(internal citations omitted). A successful assertion of personal jurisdiction must satisfy both the state long-arm statute, Ohio Revised Code §2307.382, and constitutional due process. Reynolds v. International Amateur Athletic Fed'n, 23 F.3d 1110, 1115 (6th Cir. 1994). Although the Ohio Supreme Court has held that the Ohio long-arm statute was not intended to grant jurisdiction over nonresidents to the full extent allowed by the Due Process Clause, see Goldstein v. Christiansen, 70 Ohio St.3d 232 (1994)(per curium), the Court of Appeals has "consistently focused on whether there are sufficient minimum contacts between the nonresident defendant and the forum state so as not to offend 'traditional notions of fair play and substantial justice.'" Bird v. Parsons, 289 F.3d 865, 871 (6th Cir. 2002), quoting International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945); see also Cole v. Mileti, 133 F.3d 433, 436 (6th Cir. 1998)(addressing constitutional due process rather than focusing on the reach of jurisdiction under the Ohio long-arm statute).

Facts Relating to Jurisdiction - The Fund

The Bureau argues that the Fund

> had continuous and regular contacts with the
> Bureau in the State of Ohio through its
> agents, MDL [Capital] and Olympia Capital,

6

which oversaw all administrative and management functions at the Fund. The Fund, through its agents MDL [Capital] and Olympia Capital, periodically sent reports and account information to the Bureau in Ohio. The Bureau also regularly received e-mail, mail, and telephone correspondence on behalf of the Fund from representatives of MDL [Capital] and Olympia Capital. Contacts by MDL [Capital] directed to the Bureau in the State of Ohio while acting as an agent of the Fund include the following:

Issuance of the PPM.

Submission of the Subscription Agreement.

Transmission of regular monthly reports reflecting monthly net assets value information of the Fund and other financial reports.

Attendance by MDL [Capital] representatives at meetings at the Bureau's offices (estimated to be 15 to 20 from January 1, 2002 through end of relationship with the Bureau).

Contacts of Olympia Capital directed to the Bureau in the State of Ohio while acting as an agent of the Fund include the following:

E-mail and telephone contacts for purposes of performing various administrative duties. Monthly Net Asset Value statements sent by e-mail.

Responses to periodic requests from the Bureau for information related to the Fund.

Copies of Fund's Board of Director meeting minutes, broker statements, bank statements, and audited financial statements sent to the Bureau.

Statements of Assets and Liabilities of the Fund sent to the Bureau.

E-mail and telephone requests from various

> Olympia Capital representatives seeking the
> Bureau's signed consent to revise the PPM.

(Plaintiff's Memorandum in Opposition to Defendants' Motions to
Dismiss at pp. 9-10.)

Conversely, the Fund claims that because it did not seek a
continuing relationship in Ohio it is not subject to jurisdiction
in this forum.  Specifically, the Fund states that it does

> not have and has never had (I) an office; (ii)
> a place of business; (iii) a bank account; or
> (iv) even a telephone listing in the State of
> Ohio.
>
> The Fund has never owned or leased any real
> estate in Ohio.
>
> The Fund has never commenced any suit in any
> court in the State of Ohio.
>
> None of the members of the board of directors
> of the Fund is a resident of the State of
> Ohio, and the activities of the Fund are not
> now, and never have been, controlled by
> persons or entities located in the State of
> Ohio.

(Motion and Memorandum of Law in Support of the Bermuda Defendants'
Motion to Dismiss at p. 13.)  Further, the Fund argues that signing
the Subscription Agreement with the Bureau does not create
jurisdiction in Ohio.  The Fund also suggests that the
administrative arrangements between the Fund, MDL Capital, and
Olympia Capital are not sufficient contacts to create jurisdiction
because MDL Capital and Olympia Capital were acting as independent
contractors and not as agents of the Fund.  Finally, the Fund
contends that, because the Subscription Agreement provides that
Bermuda law governs and designates Bermuda as a convenient forum
for all parties, the Fund did not purposefully avail itself of the
benefits and privileges of doing business in Ohio.

Viewing the evidence in a light most favorable to the Bureau,

8

the evidence suggests that the Fund was created specifically for the Bureau as an investment vehicle. Mark Lay, the CEO of MDL Capital, was the prime architect behind the Fund and was the principal player in "selling" the idea of the Fund to the Bureau. As Mr. Lay testified:

> Q. What was your objective for the fund initially?
>
> A. To provide a service to the [Bureau].
>
> Q. So initially you were thinking specifically of creating a vehicle for the bureau when the fund was created?
>
> A. For the most part, yes.
>
> Q. Okay. Now, I'm not sure how long initially lasted as you used the term [sic], but whenever we get beyond initially, did your objective for the fund change in respect of trying to grow the fund?
>
> A. I felt if we could be successful with this overlay strategy for the bureau we could then potentially at some future date take it out and market it to other large institutional funds.
>
> ***
>
> Q. Was the objective of that process to try to identify and recruit new investors to the fund?
>
> A. Not necessarily. We were just putting out feelers, letting folks know what we were doing. Our focus and concentration was the BWC, the bureau as you refer.
>
> ***
>
> Q. *** I take it that if you as a result of some of these meetings that you ran together with the prime broker prospective investors for the fund emerged and wanted to invest, you

would have welcomed that; true?

A. It depends.

***

Q. Can you explain what you mean by it depends?

A. Their investment philosophy would have had to match that of what we were doing for the bureau. So I — I mean, every money management firm would like to work with everyone, but all clients aren't good clients. So it was just important that those potential investors have a similar philosophy or match what we're doing for the bureau.

(Dep. of Mark Lay at pp. 129-31.)

Once the Fund was created with the Bureau in mind, Mr. Lay approached the Bureau in Ohio to "recommend" investing in the fund. The record states:

Q. *** Was the determination that the bureau would invest in the fund made by MDL Capital?

A. The fund being the active duration fund?

Q. Yes, sir.

A. To the best of my knowledge, MDL does not have that authority, [sic] to make that decision.

Q. All right. That decision was made by the bureau itself, correct?

A. Yes.

Q. Was that decision in response to a recommendation MDL Capital made that the bureau invest in that fund? *** When you spoke with them about investment opportunities, did you recommend that the bureau invest in the fund?

***

10

A. I recommended strategies for them to use, potentially use.

Q. Did you recommend that specific investment?

A. I recommended a strategy they could use that ultimately led to that particular product.

Q. Okay. I appreciate that, but did you make a recommendation to the bureau that it invest in the fund?

A. Recommendation is a strong word so I'm – I spoke to them about it. I spoke to them about it.

Q. Did you tell them this was an investment that you believed would help the bureau meet its objectives?

A. Yes.

***

Q. *** Was there a specific meeting at which you communicated to the bureau's representatives that an investment in the fund would help the bureau meet its objectives?

A. There was a meeting that it was brought up, yes.

***

Q. Where was that meeting?

A. Columbus, Ohio.

Q. Was it at the bureau's headquarters?

A. Yes.

(Id. at pp. 47-49.)  Further, MDL Capital, through Mr. Lay, "interacted" with the Bureau each time the Bureau made additional investments in the Fund. (Id. at p. 211.)

11

Q. When the bureau made its second investment in the fund, was there a new subscription agreement signed?

A. I don't know that.

Q. Who from MDL Capital interacted with the bureau in connection with the bureau's second investment of a hundred-million dollars in the fund?

A. Mark Lay - me.

***

Q. There came a point, did there not, when the bureau made yet a third investment in the fund; correct?

A. Yes.

Q. And that was $25 million, correct?

A. To the best of knowledge, yes.

Q. Who at MDL Capital interacted with the bureau in connection with that third investment in the fund?

***

A. Mark - me, Mark Lay.

(Id. at 211-12.)

    Facts Relating to Jurisdiction - The individual directors

*Mr. Sanders*

According to Mr. Sanders' affidavit, Mr. Sanders has had limited contact with Ohio and the Bureau.  The affidavit states, in pertinent part:

I am a resident of the State of Pennsylvania, and have never resided in the State of Ohio.

***

I have never been an employee of a company

12

headquartered in the State of Ohio.

I have never personally marketed any services or products in the State of Ohio.

I have never personally solicited any business in the State of Ohio.

I have never directly owned, leased, or possessed any real or personal property in the State of Ohio, nor have I ever maintained any telephone listing, office, or address in the State of Ohio.

I have never personally paid taxes in the State of Ohio.

I have never maintained any bank accounts in the State of Ohio.

I have never owned stocks, securities, negotiable instruments or other commercial paper in the State of Ohio.

I have never personally executed any written contracts in the State of Ohio or contracts to be performed in Ohio.

I have never personally entered into any contract that selected the laws of the State of Ohio to be applied to resolve any dispute resulting from any such contract.

I have never personally entered into any contract that selected the State of Ohio as the forum in which any dispute would be litigated.

Aside from this lawsuit, I have never been a party to any lawsuit in the State of Ohio. I am not individually a party to any contract with the Ohio Bureau of Workers' Compensation or any other Ohio resident.

I was an employee of [MDL Capital], a Pennsylvania company, and worked in its Philadelphia office from about 1996 until approximately May 2005.

13

I also served as a member of the Board of Directors of [the fund], which is separate and distinct from MDL Capital and was incorporated and based in Bermuda.

To the best of my knowledge, I have never had any communication, whether in person or by telephone or correspondence, with any person in Ohio at the [Bureau] relating to the Fund or the Bureau.

In connection with my employment with MDL Capital and my role as a member of the Fund's Board of Directors, I did not have any regular contact with the State of Ohio.

In fact, to the best of my knowledge, I have only visited Ohio four times, all of which took place in the past five to seven years. Specifically, I went to Ohio with Mark Lay in approximately 1999 to attend a performance review meeting with the Ohio State University. As for the other three visits, I attended a wedding and two dinners, none of which solicited any business in Ohio or related to the Bureau or the Fund.

(Decl. of Mr. Sanders at ¶¶ 1, 3-19.) Furthermore, according to Mr. Sanders' deposition, Mr. Sanders did not play any role with recruiting potential investors in the Fund or deciding potential investments in the Fund. The deposition states, in relevant part:

Q. Mr. Sanders, when you participated in these telephonic meetings of the board of directors of the fund, you indicated that in addition to yourself and Mr. Lay and Mr. Adatepe, you believe there were some other folks on the phone. Do you know why they were on the phone?

A. To the best of my knowledge, it was to discuss setting up the duration fund and just sort of to talk about operational issues of the fund.

Q. And during those telephonic meetings of the board, did you in fact talk about operational

14

issues of the fund?

A. From what I can recall, it was getting the PPM completed, and I guess, just establishing the fund.

\* \* \*

Q. This may sound a little silly, and I don't mean to sound silly certainly, but if one of the topics that you and the other people on the call when you had this telephonic meeting of the board was completion of the PPM, then I take it that the timing of the call was such that it was prior to the PPM being finished. Is that true?

A. I think so, that – you know, the one or two meetings that I recall – there was one prior to that and maybe one after everything had been completed.

Q. Is it fair to say that the one prior to that was for organizational purposes in connection with getting the fund up and running?

\* \* \*

A. That sounds pretty much correct, yes.

\* \* \*

Q. What were the purposes for that telephonic board meeting after the PPM was completed?

A. It was to discuss that, you know, how the fund was being operated or managed.

\* \* \*

Q. Do you remember, Mr. Sanders, what the level of assets in the fund was at the time of that meeting?

A. I think it was somewhere in the tune of a hundred-million dollars.

15

Q. You indicated that also among the topics discussed during that board meeting was new assets coming into the fund.  What was the discussion of new assets coming into the fund?

A. If there were – I think [Mr. Lay] was given a projection of whether new clients would come in if there were any new assets on the horizon.

***

Q. During the time frame of this meeting, was there anyone other than Mr. Lay who was prospecting for additional investors in the fund?

***

A. No, it was Mark's baby.

Q. To your knowledge, Mr. Sanders, was there ever a time in the life of the fund when anyone other than Mr. Lay was seeking to identify and recruit additional investors for the fund?

A. Not that I recall. ***

Q. Did you ever personally seek to identify any prospective investors in the fund?

A. I never made a presentation, no.

Q. Did you ever seek to identify prospects?

A. Other than at a conference or so mentioning that we had an active duration fund, I did not.

***

Q. Did Mr. Lay to your recollection ever solicit the input of the other directors of the fund in charting the direction of the fund?

***

16

A. Not that I recall.

Q. Do you have any recollection of the board of directors of the fund at any time having engaged in strategic planning for the future of the fund?

***

A. No.

***

Q. Were you called upon at any point to provide advice to the fund in respect of what you foresaw was going to happen with interest rates?

***

A. No. ***

***

Q. And there were different kinds of securities in which the fund invested the moneys, correct?

***

A. I didn't make the investment decision there so I don't know.

(Dep. of Mr. Sanders at pp. 36-40, 41, 43-46, 70-71.)


*Mr. Adatepe*

Like Mr. Sanders, Mr. Adatepe also had limited contact with the Bureau and the State of Ohio.  Mr. Adatepe's affidavit states, in pertinent part:

I was an employee of [MDL Capital] and worked in its Pittsburgh office from about 1993 until about July 2005.

I also served as a member of the Board of Directors of [the fund], which is separate and

17

distinct from MDL Capital and was incorporated and based in Bermuda.  I believe that I ceased being a member of the Board of Directors of the Fund in or about July 2004.

In connection with my employment with MDL Capital and my role as a member of the Board of Directors of the Fund, I did not have regular business contacts with the State of Ohio.

I have never had any contact, whether in person or by telephone or correspondence, with any person in Ohio at the [Bureau] relating to the Fund.

To the best of my knowledge, my only visits to Ohio for business purposes include approximately five visits with Mark Lay to the [Bureau] between 1997 and 2003 for initial presentation and subsequent performance reviews relating to the long bond account, which is not the subject of, and did not give rise to, this litigation.  In addition, I have visited approximately five times between 1997 and 2003 with Mark Lay the Ohio State University, another client of MDL Capital, for initial presentation and subsequent performance reviews.  I have not had any other business visit to Ohio.

I have never been an employee of a company headquartered in the State of Ohio.

I have never directly owned, leased or possessed any real or personal property in the State of Ohio, nor have I ever maintained any telephone listing, office or address in the State of Ohio.

I have never personally paid taxes in the State of Ohio.

I have never maintained any bank accounts in the State of Ohio.

To the best of my knowledge, I have never owned stocks, securities, negotiable

18

> instruments or other commercial paper in the
> State of Ohio.
>
> I have never personally executed any written
> contracts in the State of Ohio or contracts to
> be performed in Ohio.
>
> I have never personally entered into any
> contracts that selected the laws of the State
> of Ohio to be applied to resolve any dispute
> resulting from any such contract.
>
> I have never personally entered into any
> contract that selected the State of Ohio as
> the forum in which any dispute would be
> litigated.
>
> Aside from this lawsuit, I have never been a
> party to any lawsuit in the State of Ohio.
>
> I am not individually a party to any contract
> with the [Bureau] or any other Ohio resident.

(Decl. of Mr. Adatepe at ¶¶ 3-17.)  Moreover, according to Mr. Adatepe's deposition, he played even a more limited role as a member of the Fund's Board of Directors because he attended or participated in only one board meeting, and that meeting was held when the Fund was first launched.  (Dep. of Mr. Adatepe at p. 15-18.)

*Mr. Morrison and Mr. Lewnowski*

Mr. Morrison and Mr. Lewnowski submitted nearly identical affidavits detailing their contacts with Ohio.  The only differences in the affidavits pertain to the citizenship of each person.  The affidavits state, in relevant part:

> I am not doing, nor have I ever done business
> within the State of Ohio.
>
> I do not have and have never had: (I) an
> office; (ii) a place of business; (iii) a
> registered agent for service of process; (iv)
> a bank account; (v) a post office box; or (vi)
> even a telephone listing in the State of Ohio.

19

I have never owned or leased any real property
in the State of Ohio.

I have never been required to pay and have
never paid any taxes in Ohio.

I have never commenced any suit in any court
of the State of Ohio.

I served as a director of the [fund], a mutual
fund incorporated and based in Bermuda, from
approximately May 2002 until May 18, 2004.
While I was a director, I never traveled to
the State of Ohio for any business related to
the Fund or the [Bureau].   Nor did I
personally communicate with anyone from the
Bureau while I was a director of the Fund.

For my service as a director, I received
$2,000 per year.  I did not receive any other
compensation from the Fund or any other entity
or individual for my service as a director.

(Decls. of Mr. Morrison and Mr. Lewnowski at ¶¶ 3-9.)

Like the other members of the Board of Directors, *supra*,
Messrs. Morrison and Lewnowski had no control over the Fund's
investment decisions.   The only decision that the Board
controlled, according to Mr. Lewnowski, was to provide
clarification to the Bureau on how much money was being leveraged.
The deposition states, in relevant part:

Q. Were you involved with a determination to
revise this version of the private placement
memorandum for the Fund?

A. I was not personally involved.

Q. Are you aware that there came a point when
a determination was made to revise the [PPM]
of the Fund?

A. In the board meeting that I attended the
subject was discussed.

Q. Was that in May, 2004?

20

A. That's correct.

Q. Did the board in that meeting make a determination to revise the [PPM] for the Fund?

A. The board made the determination to provide further clarification on the guidance of leverage and a few other things. The document was a year old; and also to relate the resignation of Mr. Morrison and myself as directors and to substitute us with corporate directors.

Q. Did the board also make a determination to provide the Fund's only investor a copy of the revised [PPM]?

***

A. There is no board determination, but this is a general practice to provide shareholders of funds with information and offering memorandum.

Q. Did the board in this May, 2004 meeting which you attended determine to seek the sole investor's concurrence in the revisions to the [PPM]?

A. It was felt prudent to seek the acknowledgment of the investor that - to document the awareness of the investor to the changes of the offering memorandum of the practice of the Fund.

***

Q. In your capacity as director, did you make investment decisions for the Fund?

A. No.

Q. Did you make suitability determinations for investors?

A. No.

21

> Q. There's testimony about seeking consent
> from the Bureau to changes in the PPM.  Do you
> recall that generally?
>
> A. I recall it as an acknowledgment of a sort.
>
> Q. Right, an acknowledgment.  And when the
> board resolved to or discussed obtaining such
> an acknowledgment, on whose behalf would the
> acknowledgment be sought?
>
> A. On behalf of the fund.
>
> Q. And when those discussions were being had,
> on whose behalf were you acting?
>
> A. I acted on behalf of the Fund.

(Dep. of Mr. Lewnowski at pp. 31-33, 59-60.)

   *Warwick Fiduciary Services and Hamilton Fiduciary Services*

   The following facts relating to jurisdiction of Warwick and Hamilton were submitted via an affidavit by Carolynn Hiron, an employee of Warwick and Hamilton.   The affidavit states, in pertinent part:

> As set forth more fully below, Warwick,
> Hamilton and the Fund are entities that
> organized under the laws of Bermuda with their
> principal offices located in Bermuda. ***
>
> Warwick is an exempted company organized under
> the laws of Bermuda and located in Bermuda.
> Warwick is not doing business with the State
> of Ohio.  Nor has Warwick ever done business
> with the State of Ohio.
>
> Warwick is not and has never been authorized
> or registered to do business in the State of
> Ohio.
>
> Warwick does not have and has never had: (I)
> an office; (ii) a place of business; (iii) a
> registered agent for service of process; (iv)
> a bank account; (v) a post office box; or (vi)
> even a telephone listing in the State of Ohio.

Warwick has never owned or leased any real
property in the State of Ohio.

Warwick has never paid, and [have] never been
required to pay, any taxes in Ohio.

Warwick has never commenced any suit in any
court of the State of Ohio.

None of the members of the board of directors
of Warwick is a resident of the State of Ohio
and the activities of Warwick are not now, and
never have been, controlled by persons or
entities located in the State of Ohio.

Warwick has been a director of the Fund, a
mutual fund incorporated and based in Bermuda,
since May 18, 2004.  During this time, no
employee or representative of Warwick has ever
traveled to the State of Ohio for any business
related to the Fund or the [Bureau].

For its services as a director, Warwick was
compensated at a rate of $2,000 per year.  It
did not receive any other compensation from
the Fund or any other entity or individual for
its service as a director.

In summary, Warwick has no contacts with the
State of Ohio.

(Decl. of Ms. Hiron at ¶¶ 3-12.)  Hamilton alleges the same lack
of contacts with Ohio.  (Id. at ¶¶ 13-22.)

IV.

Specific jurisdiction is exercised over a defendant in a suit
arising out of or related to the defendant's contracts with the
forum state.  See Conti v. Pneumatic Prod. Corp., 977 F.2d 978,
981 (6th Cir. 1992).  Under International Shoe and its progeny,
the Sixth Circuit Court of Appeals has created a three-part test
to determine whether specific jurisdiction may be exercised in
compliance with the requirements of the Due Process Clause.

First, the defendant must purposefully avail
himself of the privilege of acting in the

> forum state or causing a consequence in the
> forum state.
>
> Second, the cause of action must arise from
> the defendant's activities there.
>
> Third, the acts of the defendant or
> consequences caused by the defendant must have
> a substantial enough connection with the forum
> state to make the exercise of jurisdiction
> over the defendant reasonable.

<u>Southern Machine v. Mohasco Industries</u>, 401 F.2d 374, 381 (6th
Cir. 1968).

### A. Purposeful Availment

The <u>Southern Machine</u> court called purposeful availment the
"*sine qua non*" for personal jurisdiction.  <u>Id.</u> at 381-82.  The
purposeful availment requirement "gives a degree of predictability
to the legal system that allows potential defendants to structure
their primary conduct with some minimum assurance as to where that
conduct will and will not render them liable to suit." <u>World-Wide
Volkswagen Corp. v. Woodson</u>, 444 U.S. 286, 297 (1980).  The
requirement "ensures that a defendant will not be haled into a
jurisdiction solely as a result of 'random,' 'fortuitous,' or
'attenuated' contacts, or of the 'unilateral activity of another
party or a third person.'" <u>Burger King Corp. v. Rudzewicz</u>, 471
U.S. 462, 475 (1985) (internal citations omitted).

> The unilateral activity of those who claim
> some relationship with a nonresident defendant
> cannot satisfy the requirement of contact with
> the forum State.  The application of that rule
> will vary with the quality and nature of the
> defendant's activity, but it is essential in
> each case that there be some act by which the
> defendant purposefully avails itself of the
> privilege of conducting activities within the
> forum State, thus invoking the benefits and
> protections of its laws.

<u>Hanson v. Denckla</u>, 357 U.S. 235, 253 (1958).  Accordingly, when a

defendant has "deliberately" engaged in "significant activities" within the State, or has created "continuing obligations" between himself and the forum State, the defendant "manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by the benefits and protections of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." Burger King, 471 U.S. at 475-76 (internal citations and quotations omitted).  When performing a purposeful availment analysis, it is the *quality* rather than the *quantity* of contacts that is the subject of review.  LAK, 885 F.2d at 1301.

### The Fund

As the Supreme Court noted in Burger King, there are no talismanic jurisdictional formulas; rather the facts of each case must be weighed to determine whether "personal jurisdiction would comport with fair play and substantial justice." Burger King, 471 U.S. at 486-87 (citing Kulko v. California Superior Court, 436 U.S. 84, 92 (1978)).  When analyzing whether a court has personal jurisdiction over a defendant that is consistent with due process, the actions of the defendant's agent are attributable to the actions of the defendant.  See, e.g., International Medical Group Inc. v. American Arbitration Association, Inc., 312 F.3d 833, 845 (7th Cir. 2002)(actions of a defendant's attorney are "attributable to [the defendant] for the purposes of personal jurisdiction analysis"); Daynard v. Ness, Motley, Loadholt, Richardson & Poole, 290 F.3d 42, 55 (1st Cir. 2002)("For purposes of personal jurisdiction, the actions of an agent may be attributed to the principal"); Sher v. Johnson, 911 F.2d 1357 (9th Cir. 1990)(same); Grand Entertainment Group v. Star Media Sales, Inc., 988 F.2d 776, 483 (3rd Cir. 1993)(action of defendant's agent used in determining whether court had jurisdiction over defendant-principal).

For guidance in determining whether the Fund's contacts with the Bureau in Ohio are sufficient to establish personal jurisdiction, this Court turns to Burger King, Kerry Steel v. Paragon Industries, Inc., 106 F.3d 147 (6th Cir. 1997), and Samuel Esterkyn, M.D., Inc. Pension Sharing and Profit Sharing Plan v. Van Hedge Fund Advisors, Inc., 108 F.Supp.2d 876 (M.D. Tenn. 1999).  In Burger King, a Florida corporation sued a Michigan resident in a United States District Court in Florida.  The suit was for a breach of a franchise agreement.  At issue was whether the Michigan defendants purposefully availed themselves in Florida during the negotiation and execution of the franchise agreement so that a Florida court could exercise jurisdiction over them.  Because the suit was based on contract law, the Court stated that

> we have emphasized the need for a 'highly realistic' approach that recognizes that a 'contract' is 'ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction.'  It is these factors - prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealings - that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum.

Burger King, 471 U.S. at 479 (quoting Hoopeston Canning Co. v. Cullen, 318 U.S. 313, 316-17 (1943)).  Using these factors, the Court concluded that there were sufficient contacts so that the defendant could anticipate being haled into a Florida court.

> In this case, no physical ties to Florida can be attributed to [the defendant] other than MacShara's brief training course in Miami. [The defendant] did not maintain offices in Florida and, for all that appears from the record, has never even visited there.  Yet this franchise dispute grew directly out of a contract which had a substantial connection

26

with that State.  Eschewing the option of operating an independent local enterprise, [the defendant] deliberately reached out beyond Michigan and negotiated with a Florida corporation for the purchase of a long-term franchise and the manifold benefits that would derive from affiliation with a nationwide organization. Upon approval, [the defendant] entered into a carefully structured 20-year relationship that envisioned continuing and wide-reaching contacts with Burger King in Florida.   In light of [the defendant's] voluntary acceptance of the long-term and exacting regulation of his business from Burger King's Miami headquarters, the quality and nature of his relationship to the company in Florida can in no sense be viewed as random, fortuitous, or attenuated. [The defendant's] refusal to make the contractually required payments in Miami, and his continued use of Burger King's trademarks and confidential business information, caused foreseeable injuries to the corporation in Florida.

    * * *

[The Court of Appeals'] reasoning overlooks substantial record evidence indicating that [the defendant] most certainly knew that he was affiliating himself with an enterprise based primarily in Florida.  The contract documents themselves emphasize that Burger King's operations are conducted and supervised from the Miami headquarters, that all relevant notices and payments must be sent there, and that the agreements were made in and enforced from Miami.

    * * *

Moreover, the parties' actual course of dealings repeatedly confirmed that decisionmaking authority was vested in the Miami headquarters and that the district office served largely as an intermediate link between the headquarters and the franchise.

27

Id. at 479-81 (internal citations, quotations, and footnotes omitted).

In Kerry Steel, a Michigan steel service center, Kerry Steel, offered to sell approximately $300,000 worth of steel coils to an Oklahoma pipe fabricator, Paragon Industries.  Paragon accepted the offer by telephone, following negotiations conducted via telephone and fax.  Eventually, Paragon refused to pay the full purchase price because of an alleged nonconformity with the agreed quality standards.  Kerry Steel brought suit in Michigan federal court and the court dismissed for lack of personal jurisdiction.  The Court of Appeals affirmed, stating:

> Paragon has no employees or offices in Michigan, and there has been no showing that any Paragon employee has ever been in Michigan for the purpose of conducting business there. It was Kerry Steel that initially contacted Paragon in Oklahoma - and Paragon responded without leaving home, as it were. *** Kerry Steel may or may not have reached out to Oklahoma, but in no way has it been shown that Paragon reached out to Michigan.
>
> ***
>
> The mere fact that Paragon entered into a contract with a Michigan corporation does not mean that Paragon purposefully availed itself of the "benefits and protections" of Michigan law.
>
> ***
>
> It is immaterial that Paragon placed telephone calls and sent faxes to Kerry Steel in Michigan.  To borrow language employed by this court in LAK, "[t]he telephone calls and letters on which the plaintiff's claim of jurisdiction primarily depends strike us as precisely the sort of 'random,' 'fortuitous,' and 'attenuated' contacts that the Burger King Court rejected as a basis for haling non-resident defendants into foreign

> jurisdictions."
>
> ***
>
> Not only was there no "reaching out" by
> Paragon to the Michigan plaintiff, we have
> been given no reason to believe that Paragon
> intended to establish "continuing
> relationships and obligations" in Michigan.
> *** The purchase agreement between Paragon and
> Kerry Steel represents nothing more than an
> isolated transaction, as far as the record
> discloses. There is no indication in the
> record that Paragon intended to create an
> ongoing relationship in Michigan with Kerry
> Steel.
>
> ***
>
> As in the case at bar, there was no indication
> of anything other than "one-shot" transaction,
> and it was the plaintiff who had initially
> solicited the defendant.
> ***
>
> What the case at bar comes down to, as we see
> it, is that Paragon, in response to an
> unsolicited sales call, ordered products from
> a Michigan seller and negotiated with the
> seller via fax and telephone to finalize the
> transaction. This does not constitute a
> purposeful availment of the privilege of
> transacting business in Michigan, so as to
> invoke the benefits and protections of
> Michigan law.

Kerry Steel, 106 F.3d at 151-52 (internal citations omitted).

In Van Hedge Fund, a husband and wife team ran a qualified pension plan organized under California law. The wife, Ms. Esterkyn, selected the plan's investments by doing her own independent research and reading. She eventually discovered Compass E, a hedge fund managed by Mr. Bush. Impressed by Compass E's and Mr. Bush's results, Ms. Esterkyn contacted Compass E to purchase shares in the hedge fund but was directed to contact Van

29

Hedge Fund, a Tennessee investing company, to invest in Compass E.

Through conversations with Van Hedge Fund, Ms. Esterkyn received a Private Placement Memorandum about Compass E that contained a supplement for United States investors. Among other things, the Private Placement Memorandum indicated that once shares were purchased, all controversies were to be resolved by reference to the laws of the Bahamas. Further, the Private Placement Memorandum indicated that all information contained in the Private Placement Memorandum was from "sources believed to be reliable. Data are not necessarily audited or independently verified." Van Hedge Fund, 108 F.Supp.2d at 885.

The Esterkyns invested $500,000 into Compass E, but after only a few months, the investment was worth only $100,000. Eventually, Ms. Esterkyn discovered that Compass E's audits were fraudulent and that Mr. Bush was removed as Compass E's hedge fund manager. The Esterkyns brought suit against several individuals associated with Compass E, including Mr. Bush, the Van Hedge Fund, and Compass E's asset management consultant and board of directors (almost all of whom were overseas residents). After reviewing the jurisdictional facts, the court concluded that the non-Tennessee defendants (namely everyone except Van Hedge Fund) were subject to jurisdiction in a Tennessee court. The court stated, inter alia, that

> the non-Tennessee defendants knew that investments in Compass E stock would be marketed throughout the United States. The PPM stated that the sales activity of the company in the United States would include trading and investment programs offered through brokers, dealers and custodians, some of which are in the United States. The supplemental disclosure form was prepared expressly for American investors and states that "with the consent of the company," Compass E shares can be sold in the United

> States.
>
> ***
>
> Mr. Bush's company referred Mrs. Esterkyn to Van Hedge...in Tennessee who had Compass E's PPM and were offering investments in Compass E stock in Tennessee.
>
> ***
>
> Under these circumstances, the Court concludes that these defendants' marketing of these investments through designated agents in the Tennessee market and in this District is sufficient to invoke the Court's jurisdiction over them.

Id. at 890.

After reviewing the jurisdictional facts in a light most favorable to the Bureau and comparing them to Burger King, Kerry Steel and Van Hedge Fund, this Court concludes that the Fund manifestly availed itself of the privilege of conducting business in Ohio. MDL Capital had a dual relationship with the Fund. On the one hand, MDL Capital was the Fund's investment advisor in charge of identifying and selecting the Fund's investments. On the other, MDL Capital, through Mr. Lay, was vested with the duty of "recommending" the Fund to the Bureau as a potential investment opportunity. In its role as investment advisor, MDL Capital contends that it acted as an independent contractor. Even if that is so, the nature of MDL Capital's role as investment advisor is not determinative of whether the Fund purposefully availed itself in Ohio. Rather, this Court concludes, viewing the facts in a light most favorable to the Bureau, that MDL Capital's role in creating the Fund for the Bureau in Ohio and recommending that the Bureau invest in it  encompassed duties similar to those of an agent. Specifically, Mr. Lay's actions on behalf of the Fund to "recommend" the Fund to the Bureau in Ohio, set up the Bureau's

31

account with the Fund, and "interact" with the Bureau to obtain three investments totaling $225 million were consistent with an agency-principal relationship.

The Fund was created specifically for the Bureau as an investment vehicle. If other entities wished to invest in the Fund, their investment strategies were required to be similar to the Bureau's. Further, Mr. Lay traveled to Ohio and held a meeting there with representatives from the Bureau. Once the Bureau was "convinced" that the Fund was the right investment opportunity, the Bureau signed a subscription agreement in Ohio and initially purchased $100 million worth of shares in the Fund. Over the course of the Bureau's investment in the Fund, the Bureau ultimately invested $225 million.

Because the Fund was created with the Bureau as its primary investor, the Fund, acting like the defendants in Van Hedge Fund who knew that investments in Compass E stock would be marketed throughout the United States, deliberately reached out to the Bureau in Ohio and "recommended" that the Bureau alter its current investment strategy by adding the Fund to its portfolio. By doing this, the Fund obviously knew that it was purposefully affiliating itself with an Ohio governmental institution. Given the importance of investing the Bureau's money (money that is relied on by Ohio workers), the Fund knew the significance and importance of the future consequences of its management of that money. This deliberate action, which includes three separate and important investments, goes beyond the "one-shot" transaction in Kerry Steel. Where the defendants in Kerry Steel failed to "reach out" and create "continuing relationships and obligations," the Fund, in the instant case, affirmatively contacted the Bureau in Ohio and initiated what appeared to be a structured multi-million dollar business investment. Moreover, it cannot be denied that Ohio has a manifest interest in providing effective means of

32

redress for its state governmental institution when those institutions sign contracts that have substantial connections to the State.  See, e.g., McGee v. International Life Insurance Co., 355 U.S. 220 (1957).

Finally, given the fact that the Fund deliberately "reached out" to the Bureau in Ohio to invest $225 million, this Court concludes that the choice-of-law provision is entitled to little weight in determining whether the Fund purposefully availed itself in Ohio.  While a choice-of-law provision, alone, is insufficient to establish jurisdiction, those provisions can "reinforce [a] deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there."  Burger King, 471 U.S. at 482.  Here, the agreement between the Bureau and the Fund indicated that all litigation would occur in Bermuda under the directive of Bermuda law.  However, this provision did not create a deliberate affiliation with Bermuda, nor did it create a determination that all litigation would occur there.  See, e.g., Calaphon v. Rowlette, 228 F.3d 718, 723 (6th Cir. 2000)("Here, even though [the defendant] was on notice that the contract was to be governed by Ohio law, it did not make a deliberate affiliation with that state nor could it reasonably foresee possible litigation there").

The *quality* of the Fund's contacts with Ohio, through Mr. Lay, were not random, fortuitous or attenuated.  Instead, the Fund deliberately engaged in significant activities in Ohio so that it is not unreasonable to require it to submit to the burdens of litigation in this forum.  Accordingly, the Fund purposefully availed itself in Ohio and satisfied the first prong of the Southern Machine test.

Individual Director Defendants

The individual director defendants - Mr. Sanders, Mr. Adatepe, Mr. Lewnowski, Mr. Morrison, Warwick Fiduciary Services

33

and Hamilton Fiduciary Services - argue that they did not purposefully avail themselves in Ohio. Specifically, the individual director defendants claim that, despite their involvement as members of the Fund's board of directors, they did not actively participate in the Fund's involvement with the Bureau nor engage in any activity in Ohio. Conversely, the Bureau claims that the individual director defendants are subject to personal jurisdiction in Ohio because they "actively and personally involved themselves in tortious conduct" while serving on the Fund's board of directors. (Plaintiff's Memorandum in Opposition to Defendants' Motions to Dismiss at p. 17.)

Preliminarily, this Court notes that it is well-settled law in the Sixth Circuit Court of Appeals that jurisdiction over a corporation is not tantamount to jurisdiction over individual officers. See, Weller v. Cromwell Oil Co., 504 F.2d 927, 929 (6th Cir. 1974)("It is settled that jurisdiction over the individual officers of a corporation cannot be predicated merely upon jurisdiction over the corporation"). Rather, each defendants' contacts with the forum state must satisfy due process in order to be subject to jurisdiction in that forum. Calder v. Jones, 465 U.S. 783, 790 (1984)("Each defendant's contact with the forum State must be assessed individually"); see also Balance Dynamics Corp. v. Schmitt Industries Inc., 204 F.3d 683, 698 (6th Cir. 2000)("Hence, where an out-of-state agent is actively and personally involved in the conduct giving rise to the claim, the exercise of personal jurisdiction should depend upon traditional notions of fair play and substantial justice..."). It is with these principles in mind that the Court will evaluate the individual directors' contacts with Ohio.

After reviewing the facts connecting the individual director defendants to the Bureau in Ohio, this Court concludes that the individual director defendants did not purposefully avail

34

themselves of the privileges and benefits of Ohio law.  Viewing the facts in a light most favorable to the Bureau, all the individual director defendants had either limited or no contacts with Ohio or the Bureau.  In fact, but for Messrs. Sanders and Adatepe, none of the individual director defendants have even visited Ohio or had any direct contact with the Bureau.  Most importantly, however, is the lack of influence and control the individual director defendants had over the Fund's marketing and investment decisions.  As noted by each director's affidavit and/or deposition, the individual director defendants did not decide which investments the Fund made for the Bureau; nor is there anything in the record to suggest that the individual director defendants voted to allegedly impermissibly "over-leverage" the Fund, which is the main subject of this litigation.

This Court rejects the Bureau's argument that the individual director defendants "actively and personally involved themselves in tortious conduct...." (Plaintiff's Memorandum in Opposition to Defendants' Motions to Dismiss at 17).  Despite the allegations in the amended complaint that the individual director defendants, allegedly acting as the Fund's agents, actively and personally involved themselves in the conduct giving rise the claims in this case, there is nothing in the record to support such a claim.  Unlike the Fund's direct connection to the Bureau in Ohio through Mr. Lay's actions, the individual director defendants, according to the record, acted solely with respect to the management of the Fund and were not involved in soliciting the Bureau's investment in the Fund.

Further, nowhere in the record is there evidence that the individual director defendants voted for or against the alleged impermissible "over-leveraging" of the Bureau's money.  In fact, as stated, *supra*, the record reveals that the individual director defendants had no control over the Fund's investments.

Allegations by the Bureau of "active participation" are in-and-of-themselves insufficient to establish jurisdiction in the face of evidentiary documents to the contrary.  For example, according to the record, the Board discussed sending the Bureau the revised PPM (which outlined the plan to continue to "over-leverage" and apprised the Bureau of the board member changes) for guidance and clarification purposes only.  Accordingly, what contacts the individual director defendants had with the Bureau in Ohio can only be categorized as random, fortuitous and attenuated, which fall short of establishing purposeful availment.

<u>B. Arising From</u>

The second <u>Southern Machine</u> requirement is that "the cause of action must arise from the defendant's activities" in Ohio. <u>Southern Machine</u>, 401 F.2d at 374.  The second criteria "does not require that the cause of action formally 'arise from' defendant's contacts with the forum; rather, this criterion requires only 'that the cause of action, of whatever type, *have a substantial connection with* the defendant's in-state activities.'"  <u>Third National Bank v. WEDGE Group, Inc.</u>, 882 F.2d 1087, 1091 (6th Cir. 1989)(quoting <u>id.</u> at 384 n. 27)(emphasis added).  As the <u>Southern Machine</u> court stated: "Only when the operative facts of the controversy are not related to the defendant's contact with the state can it be said that the cause of action does not arise from that contact."  <u>Southern Machine</u>, 401 F.2d at 384 n. 29.

<u>The Fund</u>

Because the Fund allegedly impermissibly "over-leveraged" the Bureau's assets in violation of the original agreement between the Bureau and the Fund, the Bureau filed a complaint claiming violations of Ohio law.  These claims have a substantial connection with the Fund's in-state activities, which include the marketing of the Fund and the signing of the subscription agreement.

36

<u>Individual Director Defendants</u>

For the reasons described above, because the individual director defendants' contacts with Ohio were limited, and in some cases non-existent, the individual director defendants' contacts with Ohio are not substantially connected to Ohio and do not arise out of the claims alleged in this case. Instead, the operative facts of this controversy are not related to the individual director defendants' tenuous contacts with the Bureau and the State of Ohio.

<u>C. Reasonableness</u>

The final <u>Southern Machine</u> requirement is that "the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." <u>Id.</u> at 384. This involves determining

> whether [the forum state] has an interest in resolving the conflict at issue; but, once the first two questions have been answered affirmatively, resolution of the third involves merely fettering out the unusual cases where that interest cannot be found.

<u>Id.</u> at 384. When the first two <u>Southern Machine</u> criteria are met, "an inference arises that the third, fairness, is also present; only the unusual case will not meet this third criterion." <u>First National Bank v. J.W. Brewer Tire Co.</u>, 680 F.2d 1123, 1126 (6th Cir. 1982). Factors to consider when determining reasonableness include the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies. <u>Burger King</u>, 471 U.S. at 477 (citing

<u>World-Wide Volkswagen</u>, 444 U.S. at 292).  The Court elaborated:

> These considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required.  On the other hand, where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.  Most such considerations usually may be accommodated through means short of finding jurisdiction unconstitutional.

<u>Burger King</u>, 471 U.S. at 477 (internal citations omitted).

### The Fund

Assuming the allegations in the complaint are true, the acts of the Fund or consequences caused by the Fund have a substantial connection with the State of Ohio.  While there may be a slight burden on the Fund to send documents and witnesses to Ohio from Pennsylvania and Bermuda, those burdens are significantly outweighed by Ohio's interest in protecting the Bureau's assets and investments.  Moreover, the Bureau, which manages the money for Ohio employees, also has a substantial interest in litigating this suit in this Ohio federal court.  Taken together, the interest that the Bureau and Ohio share in litigating this case in this forum outweigh any slight burden on the Fund.  Accordingly, because the Fund purposefully directed its marketing and investment strategies at the Bureau in Ohio, no compelling case exists that would render jurisdiction unreasonable.

### Individual Director Defendants

This Court concluded, *supra*, that the first two prongs of <u>Southern Machine</u> are not met.  Unlike the Fund, therefore, there is no inference that reasonableness is present.  Rather, the lack of connection the individual director defendants have with the Bureau in Ohio would make it unreasonable to subject them to

38

jurisdiction in this forum.

V.

As indicated earlier, in order to establish personal jurisdiction, a defendant's contacts with Ohio must satisfy both the Due Process Clause and the Ohio Long-Arm statute, R.C. §2307.382.  That statute states, in relevant part, that "[a] court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action arising from the person's...[t]ransacting any business in this state...."  R.C. §2307.382(A)(1).  As the Supreme Court of Ohio indicated

> [i]t is clear that R.C. 2307.382(A)(1)...[is] very broadly worded and permit[s] jurisdiction over nonresident defendants who are transacting any business in Ohio.  "Transact," as defined by Black's Law Dictionary..."means to *prosecute negotiations*; to carry on business; *to have dealings* * * *.  The word embraces in *its meaning the carrying on or prosecution of business negotiations* but it is a *broader term than the word 'contract' and may involve business negotiations* which have been whether wholly or partly brought to a conclusion * * *."

Kentucky Oaks Mall Co. v. Mitchell's Formal Wear, Inc., 53 Ohio St.3d 73, 75 (1990).  Because "transacting" business is such a broad statement that confers jurisdiction,

> R.C. §2307.382(A)(1) have given rise to a variety of cases which have reached their results on highly particularized factual situations, thus rendering any generalization unwarranted.  With no better guideline than the bare wording of the statute to establish whether a nonresident is transacting business in Ohio, the court must, therefore, rely on a case-by-case determination.

U.S. Sprint Communications Ltd. Partnership v. Mr. K's Foods, Inc., 68 Ohio St.3d 181, 185 (1994)(internal citations and quotations omitted).

39

<u>The Fund</u>

The Fund argues that it did not "transact" business in Ohio because it failed to solicit or encourage investment in the Fund. For support, the Fund cites <u>Embs v. Jordan Outdoor Enterprises, Ltd.</u>, No. 2:03-cv-895, 2004 U.S. Dist. Lexis 27962 (S.D. Ohio 2004)(Graham, J.) and <u>The Kroger Co. v. Malease Foods Corp.</u>, 437 F.3d 506 (6th Cir. 2006).

In <u>Embs</u>, a defendant corporation, JOEL, engaged in business in Ohio selling camouflage. The plaintiff, Mr. Embs, sued JOEL and its CEO for patent infringement in Ohio. JOEL and the CEO moved to dismiss for lack of personal jurisdiction under the Ohio long-arm statute, and this Court granted the CEO's motion. The Court stated:

> Embs argues that this Court has personal jurisdiction over [the CEO] because of his business contacts with Ohio. Embs points to JOEL's website, which shows 73 dealers in Ohio where allegedly infringing products are possibly sold. ***
>
> ***
>
> The Court finds that it does not have jurisdiction over [the CEO] pursuant to [the Ohio long-arm statute]. ***
>
> ***
>
> There is no evidence that [the CEO] sold goods or licensed camouflage patterns to any business or individual in Ohio. It is true, as Embs argues, that JOEL has 73 authorized dealers in Ohio, but [the CEO] did not transact business or enter into contracts with those dealers on behalf of JOEL. *** Nor is there evidence that [the CEO] entered into licensing contracts with any fabric manufacturers in Ohio.

<u>Embs</u>, 2004 U.S. Dist. Lexis 27962, at *9-10.

In <u>Kroger</u>, an Ohio lessor brought suit alleging, *inter alia*,

40

breach of contract against an out-of-state corporation.  The facts in Kroger are complex.  The plaintiff, Kroger, entered into a sale-leaseback agreement with Balkhouse Properties, a Tennessee corporation, where Kroger sold Balkhouse Properties a piece of real property and Balkhouse Properties then leased the real property back to Kroger.  Balkhouse Properties then conveyed fee simple interest to Balkhouse Associates.  After a series of transactions involving other parties, Balkhouse Associates held fee simple title to the property, Malease Foods, a Delaware corporation, held the master lessee interest and was the primary tenant, and Kroger was Malease's subtenant.

Kroger attempted to purchase the master lessee's rights from Malease under an agreement, and Malease refused.  As a result, Kroger sued Malease in the United States District Court for the Southern District of Ohio.  Malease moved to dismiss for lack of personal jurisdiction, and the district court denied that motion. On appeal, the Sixth Circuit Court of Appeals reversed, holding that Malease did not "transact" business under the Ohio long-arm statute.  The Court stated:

> Kroger relies on *Kentucky Oaks* to demonstrate that jurisdiction over Malease is proper. While there are similarities between *Kentucky Oaks* and the instant facts, there are also substantial differences.  In *Kentucky Oaks*, [the defendant] directly negotiated the terms of the lease with [the plaintiff].  In contrast, Malease never entered into *any* negotiations with Kroger regarding the terms of the lease, let alone direct negotiations. Instead, Malease became involved with Kroger simply by virtue of the assignment of the leases from Balkhouse.  In essence, Malease was one step removed from the bargaining process, so it cannot be said that Malease directly sought the benefit of the bargain for purposes of mutual pecuniary gain, because Malease did not negotiate the lease with Kroger originally.

41

Kroger, 437 F.3d at 512 (emphasis in original).

The Fund's reliance on Embs and Kroger is misplaced. First, unlike the CEO in Embs who did not contract or transact business in Ohio, the Fund, through the actions of its agent Mr. Lay, entered into a subscription agreement with the Bureau in Ohio. Further, the Fund, through Mr. Lay, marketed the Fund to the Bureau in Ohio and affirmatively sought out the Bureau's investment in the Fund. Second, the instant case is not a situation where the Fund was one step removed from the bargaining process. Instead, the Fund, through Mr. Lay, was deliberately involved with selling shares of the Fund to the Bureau. Through these actions, the Fund sought directly the benefit of the bargain for purposes of mutual pecuniary gain because the Fund did negotiate the subscription agreement directly with the Bureau in Ohio.

The events that lead up to the Bureau's signing the subscription agreement must be characterized, at a minimum, as the prosecution of business negotiations. Further, because there is an actual contract signed in Ohio between the Fund and the Bureau, these actions must fall squarely within "transacting any business" in Ohio because the word "transacting," within the reach of the Ohio long-arm, is broader than contracting itself. See Kentucky Oaks, 53 Ohio St.3d at 75. The business transactions between the Fund and the Bureau are analogous to those in Kentucky Oaks where the defendant affirmatively reached out to Ohio for contract negotiations. Based on this evidence, this Court concludes that the Fund "transacted" business in Ohio within the purview of the Ohio long-arm statute.

### Individual Director Defendants

Unlike the Fund, the individual director defendants were not involved in the subscription agreement negotiations, nor were the individual director defendants involved with the signing of the

subscription agreement itself.  This lack of action with the Bureau in Ohio does not fall within the reach of the Ohio long-arm statute.  Further, as noted above, the U.S. Constitution does not permit the exercise of jurisdiction over these defendants.

VI.

In sum, the MDL Defendants' Motion to Dismiss Complaint (doc. #45) is GRANTED to the extent of Messrs. Sanders' and Adatepe's motion to dismiss for lack of personal jurisdiction.  Further, the Bermuda Defendants' Motion to Dismiss the Complaint (doc. #46) for lack of personal jurisdiction is GRANTED in part, and DENIED in part.  The motion is DENIED as applied to the Fund and GRANTED as applied to Mr. Morrison, Mr. Lewnowski, Hamilton Fiduciary Services, Ltd. and Warwick Fiduciary Services, Ltd.  The claims against defendants Sanders, Adatepe, Morrison, Lewnowski, Hamilton Fiduciary Services, Ltd. and Warwick Fudiciary Services, Ltd., are DISMISSED WITHOUT PREJUDICE.  The Fund shall file an answer within ten days.

It is so ORDERED.


s/James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE:  June 1, 2006